IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
ALBERT VAUGHN, SR.,            )
Administrator for the          )
Estate of Albert Vaughn,       )
Jr.,                           )
                               )
            Plaintiff,         )
      v.                       )   No. 14 C 47
                               )
CITY OF CHIACGO, MICHAEL       )
COLLINS, ROBERT CUMMINGS,      )
and MIGUEL RENTERIA,           )
                               )
            Defendants.        )
```

MEMORANDUM OPINION AND ORDER

Albert Vaughn, Sr. ("Vaughn"), the administrator of his deceased son's estate, claims that the City of Chicago and three of its police officers (collectively, "Defendants") violated his son's due process rights when they ordered him to drop his weapon during an altercation in West Englewood and then failed to protect him against a deadly assault.

Defendants have moved for summary judgment on the ground that no reasonable jury could return a verdict in Vaughn's favor. They also seek summary judgment based on qualified immunity. For the reasons stated below, I grant Defendants' motion.

I.

At the summary judgment stage, I must view the facts in the light most favorable to Vaughn and "give [him] the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence." *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 674 (7th Cir. 2014).

A.

On August 5, 2008, around 10:00 or 10:30 pm, Albert Vaughn, Jr. ("Albert") got into an argument with someone named Baron at a house party in the 7000 block of South Throop Street in Chicago, Illinois. *See* Defs.' Ex. B ("Alvin Dep.") at 16. The argument escalated into a fight outside the house. *Id.* at 16-17. Albert, who was eighteen years old at the time, knocked Baron unconscious and then went home with his younger brother Alvin Vaughn ("Alvin") and a friend named Fabian Stallworth ("Fabian"). *Id.* at 17.

At home, Albert and Alvin realized they had left their younger brother at the party and decided to go back for him. *Id.* As they were preparing to leave, Alvin heard Baron's friends banging on the door. *Id.* The banging stopped once police arrived in the area, at which point Albert, Alvin, and Fabian left the house and walked back to Throop Street. *Id.* at 18. In order to protect themselves, the three boys ripped

boards with protruding nails from a porch and carried them back to the scene. *Id*. at 19.

Meanwhile, Chicago Police Department Officer Robert Cummings ("Officer Cummings") and his partner, Keion Feizel ("Officer Feizel"), had arrived at 70th and Throop Streets in response to a dispatch reporting a battery in progress. *See* Defs.' Ex. D ("Cummings Dep.") at 7. They were the first police officers to arrive. *Id.* at 9. When asked to describe the scene, Officer Cummings testified, "It was total chaos. People fighting everywhere. I'm guessing fifty people minimum out fighting in the streets." *Id.* at 10; *but see* Defs.' Ex. G ("Feizel Dep.") at 15 (testifying that no fights were taking place when he arrived).

Officer Cummings immediately called for backup and an ambulance to transport Baron to the hospital. *Id*. at 9. Additional officers, including Defendants Michael Collins and Miguel Renteria, started arriving at the scene within a minute of Officer Cummings's call for backup. *Id*. at 14. Officer Cummings then started breaking up fights and trying to disburse the crowd. *Id*. at 14-15. It took approximately five to six minutes to break up all of the fights in progress. *Id*. at 16.

Albert, Alvin, and Fabian arrived at the scene as police officers were trying to disperse the crowd. *See* Alvin Dep. at 18. Alvin testified that about five police officers drew their

guns and ordered the boys to drop the wooden boards they were carrying. *Id.* at 18, 35. Officer Cummings admits that he pointed his gun at the three boys, ordered them to drop the boards, and threatened to arrest them unless they left. *See* Cummings Dep. at 35, 37. Albert and his two companions dropped their weapons, but refused to leave. *See* Alvin Dep. at 20. Instead, they started arguing with Baron's friends who were divided into two groups, one standing across the street and the other to their side. *Id.* at 22. The shouting match, during which Baron's friends shouted threats, lasted ten to fifteen minutes with about ten Chicago police officers standing nearby. *Id.* at 24, 35-36.

According to Alvin, a young man named Nathaniel Tucker ("Tucker") suddenly emerged from a nearby house and hit Albert twice with a metal baseball bat. *Id.* at 18, 25. Alvin, whose focus was trained on Baron's friends, did not notice Tucker until after he had bludgeoned Albert in the head. *Id.* at 25-26. Albert died from his injuries. The closest police officer, whom Alvin could not identify by name, was standing about ten to fifteen feet away in the middle of Throop Street at the time of the attack. *Id.* at 26. Alvin saw Tucker run away with several police officers chasing after him. *Id.* at 27. Tucker was arrested a few minutes after attacking Albert and later pleaded guilty to first degree murder.

B.

The Chicago police officers who were on the scene tell conflicting stories about how the attack occurred. Officer Cummings testified that Albert approached him after dropping the wooden board he had been carrying. *See* Cummings Dep. at 35. Albert refused to leave the scene until he found his little brother. *Id*. Officer Cummings told Albert the party was over and threatened to arrest him unless he left. *Id*. Albert complied and started walking south on Throop Street. *Id.* Officer Cummings returned his attention to dispersing the crowd when he saw Tucker jump out from behind an ambulance and hit Albert twice with a baseball bat. Cummings Dep. at 26-27, 35. Officer Cummings estimates he was standing about twenty five feet away from the attack, which lasted only five or six seconds. *Id*. at 26, 36. After witnessing the attack, Officer Cummings was part of the group that chased Tucker and apprehended him in a nearby house. *Id*. at 28.

Like Officer Cummings, the other CPD officers who testified in this case also ordered Albert to walk away from the party, but they saw Tucker run across the street rather than pop out from behind an ambulance. Officer Feizel, for instance, encountered Albert walking north on Throop Street with a "stick" in his hand towards the house where the party had taken place. *See* Defs.' Ex. G ("Feizel Dep.") at 12. Officer Feizel ordered

5

Albert and his two associates to drop their sticks and walk in the opposite direction. *Id*. at 12-13. Albert complied and then "moments later" Tucker "just came out of nowhere with the bat, struck him." *Id*. at 13. Officer Feizel later clarified that he saw Tucker come from the opposite side of the street with the bat hidden behind his back. *Id*. at 20, 23. Officer Feizel was standing about twenty feet away from where Albert was attacked. *Id*. at 14.

Officer David McGrew ("Officer McGrew"), like Officer Feizel, encountered Albert and two to four associates walking north on Throop Street. *See* Dkt. No. 41-1 ("McGrew Dep.") at 14. Albert seemed to be "worked up" and "in an aggressive mood," but his hands were empty by the time Officer McGrew saw him. *Id*. Officer McGrew instructed Albert's group to leave the scene, after which they turned around and walked south. *Id*. After watching them for a few seconds, Officer McGrew returned to dispersing the crowd. Albert was no more than twenty feet away when Officer McGrew noticed a "very fast movement" in his peripheral vision. *Id*. at 17. Officer McGrew witnessed Tucker hit Albert twice with a baseball bat in the span of only a few seconds. *Id*. at 19. Tucker ran from the scene with his bat in hand. *Id*. at 23.

Officer Robert Mangan's account is similar. He instructed Albert, who was empty handed, to turn around and walk away from

6

the house party. *See* Dkt. No. 37-1 ("Mangan Dep.") at 16. As Albert was walking away, Officer Mangan heard him arguing with someone across the street. *Id*. at 17. Albert walked towards the curb and his antagonist, Tucker, started walking across the street. *Id*. at 18. Officer Mangan saw Albert make a gesture with his hands indicating that he was challenging Tucker to a fight. *Id*. At that point, Tucker ran up to Albert and hit him twice with a bat and took off running. *Id*. at 18-19. Officer Mangan was standing twenty five to thirty feet away during the attack. *Id*. at 19. Officer Mangan attended to Albert while other officers chased Tucker. *Id*.

Yet another account of the attack comes from Officer Collins, who testified that about 200 to 300 people were on the street when he arrived. *See* Defs.' Ex. C at 9. Officer Collins's attention was first drawn to Albert a few seconds before the attack while he was arguing loudly with Tucker. Collins Dep. at 13-15, 26, 28. Officer Collins was standing about twenty to fifty feet away trying to disperse the crowd when "out of the melee, the crowd, the offender comes running out with the baseball bat and strikes the victim in the head." *Id*. at 16. According to Officer Collins, the entire attack lasted only five to seven seconds. *Id*. at 27.

Officer Renteria provided another variation on how the attack happened. He saw Vaughn standing on the east side of

7

Throop Street holding a "stick" and being aggressive. *See* Defs.' Ex. E ("Renteria Dep.") at 11, 13. Officer Renteria ordered Albert to get back on the sidewalk, but Albert refused and continued to walk into the street. *Id*. at 13, 23. "At the same time from the west side, [Officer Renteria] observed Mr. Tucker coming at him with a bat." *Id*. at 14. Officer Renteria was standing about fifty feet away as Tucker clubbed Albert with the baseball bat. *Id*. at 12, 15. Officer Renteria witnessed only one swing of the bat. *Id*. at 18. The entire incident, from the time Officer Renteria ordered Albert to get back on the sidewalk until the end of the attack, lasted only three to five seconds. *Id*. at 17.

## II.

Vaughn sued the City of Chicago and Officers Collins, Cummings, and Renteria under 42 U.S.C. § 1983 for allegedly violating his son Albert's due process rights. Defendants have now moved for summary judgment. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

I start with the doctrinal background for Vaughn's due process claim. "As a general matter...a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197 (1989). "*DeShaney,* however, leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Reed v. Garner*, 986 F.2d 1122, 1125 (7th Cir. 1993). Stated differently, the Due Process Clause "may...demand protection if the state disables people from protecting themselves; having rendered someone helpless, the state must supply the sort of defenses that the person could have provided on his own." *Witkowski v. Milwaukee Cnty.*, 480 F.3d 511, 513 (7th Cir. 2007).

The Seventh Circuit has identified three "principles" that govern due process claims under the state-created danger doctrine:

> First, in order for the Due Process Clause to impose upon a state the duty to protect its citizens, the state, by its affirmative acts, must create or increase a danger faced by an individual.
>
> Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual.
>
> Third, because the right to protection against state-created dangers is derived from the substantive component of the Due Process Clause, the state's

9

failure to protect the individual must shock the conscience.

*King ex rel. King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812 (7th Cir. 2007) (internal citations omitted and paragraph breaks added); *but see Slade v. Bd. of Sch. Dirs. of the City of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012) (proposing a simplified formula for resolving state-created danger cases).

Defendants argue that no reasonable jury could find that they (1) affirmatively created or increased the danger facing Albert when he voluntarily returned to a dangerous environment; (2) proximately caused his injuries; or (3) failed to protect him in a manner that shocks the conscience. There is no need to address Defendants' first two arguments because their third one is dispositive. *See Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (following similar approach).

A.

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional

10

conduct, such as recklessness or gross negligence is a matter for closer calls." *Id*. at 849 (internal quotation omitted). "[A]n exact analysis of circumstances [is required] before any abuse of power is condemned as conscience shocking." *Id*. at 850.

The Seventh Circuit has criticized the "shocks the conscience" standard and questioned what, if anything, it adds to the concept of recklessness. *See Slade*, 702 F.3d at 1033. At bottom, the standard serves as "a reminder that liability for a constitutional tort requires proof that the defendant acted (or failed to act) not merely negligently but recklessly (equivalently, with 'deliberate indifference' to the risk of harm that he was creating)." *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008).

In this case, it was entirely reasonable for the police to order Albert to drop the weapon he brought back to the disturbance on Throop Street. The real question is whether Defendants failed to protect Albert in a way that shocks the conscience after disarming him in a dangerous environment. That question requires me to consider the varying accounts of how the attack occurred.

According to Alvin Vaughn and Officer Cummings, Tucker attacked Albert without warning after hiding in a nearby house or behind an ambulance. Only a personal bodyguard might have

11

protected Albert against Tucker's ambush.  Vaughn has not cited any cases suggesting--much less holding--that the Due Process Clause required Defendants to provide Albert with a bodyguard simply because they ordered him to drop his weapon.  Indeed, the Seventh Circuit has underscored that "extraordinary measures" like providing Albert with a bodyguard are not constitutionally required.  *Reed*, 986 F.2d at 1127; *see also Slade*, 702 F.3d at 1031 (cautioning that "recognition of a constitutional right to adequate police protection and other public assistance would place federal judges in control of much of the apparatus of government").  In short, accepting Alvin's and Officer Cummings's accounts as true, no reasonable jury could find that Defendants' failure to protect Albert from an ambush shocked the conscience.

The other police officer witnesses testified that they instructed Albert to walk away from the site of the party, after which Tucker ran across Throop Street and attacked him.  The closest officers were standing about twenty feet from the attack, which happened in five to seven seconds at the longest.  Again, Vaughn's claim boils down to Defendants' failure to assign a personal bodyguard for Albert or such a close degree of supervision that Tucker could have been intercepted before he hit Albert with a baseball bat.  After instructing Albert to walk away from the party, Defendants faced a choice between

returning their attention to crowd control or personally escorting Albert away from the scene. Where, as here, police officers must make an "instant judgment" about how to deploy their resources, "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates [due process concerns]." *Lewis*, 523 U.S. at 853. There is no evidence in this case from which a reasonable jury could infer that Defendants, facing a riot-like situation in the street, acted with a "purpose to cause [Albert] harm." *Id*. at 854. It follows that they are entitled to summary judgment. *See McDowell v. Vill. of Lansging*, 763 F.3d 762, 767 (7th Cir. 2014) (affirming summary judgment for police officer whose "snap judgment" about where to devote his attention while breaking up a fight rendered plaintiff more vulnerable to a kick in the face by one of the belligerents).

B.

Because Vaughn's due process claim fails on the merits, I need not address Defendants' additional argument that they are entitled to qualified immunity. *See McDowell*, 763 F.3d at 766 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

IV.

Defendants' motion for summary judgment is GRANTED for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: June 18, 2015